## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 13-cv-1363 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF STATE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFF'S MOTION FOR DISCOVERY PURSUANT TO
### RULE 56(d) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Plaintiff Judicial Watch, Inc., by counsel, respectfully moves pursuant to Rule 56(d) of

the Federal Rules of Civil Procedure for time to take discovery.[1]  As grounds therefor, Plaintiff

states as follows:

### STATEMENT OF POINTS AND AUTHORITIES

**I.      Introduction.**

For six years, Defendant U.S. Department of State ("State Department" or "Department")

and its former secretary, Hillary Rodham Clinton ("Mrs. Clinton), kept the public in the dark

about the creation of an "off-grid" record system, which was used by Mrs. Clinton and at least

one of her closest advisors, Huma Abedin, to conduct official government business and

communicate with fellow State Department employees and other federal government employees,

including those at the White House, as well as foreign leaders and other interested individuals.

The public's lack of awareness continued even though the State Department received and

responded to dozens – if not hundreds – of Freedom of Information Act ("FOIA") requests for

---

[1]      Plaintiff files this motion pursuant to the Court's October 23, 2015 Minute Order.  Oral argument has been scheduled for February 23, 2016.  *See* October 6, 2015 Minute Order.

records of Mrs. Clinton.  The State Department and Mrs. Clinton only acknowledged the system

when compelled to do so by a *New York Times* report in March 2015.  Had the *New York Times*

not run the story, the public may never have known about the "off-grid" system.

Although the public now knows about the "off-grid" system, it does not definitively

know how and why the State Department and Mrs. Clinton, even despite receiving numerous

FOIA requests, kept the record system secret during Mrs. Clinton's entire four years as secretary

and for the two years subsequent.  Based on limited, admissible evidence and other reliable

information, there is at least a "reasonable suspicion" that the State Department and its former

secretary deliberately thwarted FOIA by creating, using, and concealing the "off-grid" system.

Because the system was "off-grid," it was not searched in response to Plaintiff's FOIA request

and other FOIA requests received during Mrs. Clinton's tenure as secretary or the two years that

followed.  In addition, the State Department appears to have allowed Mrs. Clinton to leave the

agency without providing an inventory of the records on the system or ensuring access to all

federal records on the system.

While Mrs. Clinton ultimately returned approximately 55,000 pages of federal records

from this "off-grid" system to the State Department, the process for identifying the federal

records on the system was undertaken by Mrs. Clinton's private attorneys, individuals only

accountable to the former secretary, not employees accountable to the Department.  In addition,

there is no evidence that the process complied with appropriate federal records laws, rules, and

regulations.  The net result is that the integrity of the State Department's FOIA process has been

completely and thoroughly undermined to the substantial detriment of FOIA requesters like

Plaintiff who submitted requests to the Department implicating Mrs. Clinton's official email.  In

addition to ensuring that the State Department has satisfied its FOIA obligations with respect to the request at issue in this case, a compelling need exists to restore the integrity of the FOIA process at the State Department and ensure accountability for the FOIA violations that occurred.

Before this can be accomplished, however, Plaintiff requires discovery to uncover and present admissible evidence to the Court about whether the State Department and Mrs. Clinton deliberately thwarted FOIA. Plaintiff also requires discovery of the system itself to determine possible methods for recovering whatever responsive records may still exist. The Court therefore should grant Plaintiff time to conduct discovery and obtain admissible evidence.

## II.     The State Department's Motion for Summary Judgment.[2]

The FOIA request at issue in this case and the lawsuit itself has a long, complicated history. However, there are three indisputable facts. First, Plaintiff sent a FOIA request to the State Department seeking records that would likely include emails of Mrs. Clinton and Ms. Abedin. Defendant's Statement of Material Facts ("Def's Stmt." at ¶ 7). Second, Mrs. Clinton had left the State Department before Plaintiff submitted its FOIA request. *Id*. at ¶ 1. Third, the State Department has only searched a self-selected portion of the "clintonemail.com" record system for records responsive to Plaintiff's FOIA request. *Id*. at 7. Taking these facts into consideration, the State Department moved for summary judgment.

"[An] agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby v. Department of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). By moving for summary Judgment, the State Department asks the Court to determine whether it has searched *all* systems that are likely to contain records responsive to

---

2       As agreed upon by the parties and adopted by the Court, Defendant's motion is stayed until the Court rules on Plaintiff's Motion for Discovery. *See* October 23, 2015 Minute Order.

Plaintiff's FOIA request.  Because it has not searched the "off-grid" system, the State

Department, however, has failed to search all relevant record systems and, by doing so, has also

failed to conduct a search "'reasonably calculated to uncover *all* relevant documents.'"  *Nation*

*Magazine v. U.S. Customs Service*, 71 F.3d 885, 890 (D.C. Cir. 1995) (*quoting Truitt v. U.S.*

*Department of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)) (emphasis added).  The

"clintonemail.com" system is a relevant record system.  *See Chambers v. U.S. Department of the*

*Interior*, 568 F.3d 998, 1005-1006 (D.C. Cir. 2009) (The D.C. Circuit concluded that an agency's

search would not be adequate if records were deliberately destroyed in order to avoid producing

them.).  Such a search would not be "reasonably calculated to uncover all relevant [records] . . .

but instead would be designed to keep concealed the particular document that is most relevant."

*Id*.; *see also Landmark Legal Foundation v. Environmental Protection Agency*, 959 F. Supp. 2d

175, 182 (D.D.C. 2013) (determining that any search that did not include the personal email

accounts of senior officials would not be reasonably calculated to uncover all relevant records).

In addition, *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136

(1980), does not address what is required of an agency when an "off-grid" record system is

created and used by the agency head and the record system is ultimately removed from the

agency without an inventory of all federal records on that system or ensuring that those records

are readily available to the agency.  As the D.C. Circuit has explained, "The Supreme Court, in

*Kissinger*, raised but did not decide whether the 'possession or control' requirement 'might be

displaced in the event that it was shown that an agency official purposefully routed a document

out of agency possession in order to circumvent a FOIA request.'"  *National Security Archive v.*

*Archivist of United States*, 909 F.2d 541, 546 (D.C. Cir. 1990) (*quoting Kissinger*, 445 U.S. at

155).  Although no case is entirely on point, the Court's ruling in *Landmark Legal Foundation* is more instructive than the Supreme Court's opinion in *Kissinger*.

### III. The "Critical Issue" Is the Motivation behind the Creation and Use of an "Off-grid" Record System by the State Department and Mrs. Clinton.[3]

Before the Court can determine whether the State Department's belated search of only a self-selected portion of the records from Mrs. Clinton's "off-grid" system satisfied FOIA, it first must decide whether Mrs. Clinton and the State Department deliberately thwarted FOIA by creating, using, and concealing the system.  In *Landmark Legal Foundation*, the FOIA requester sought records of senior officials at the Environmental Protection Agency.  959 F. Supp. 2d at 177.  Prior to summary judgment, the FOIA requester learned that some of those officials may have used personal email accounts for official business.  *Id*. at 180.  Because these accounts were not searched for records responsive to the FOIA request at issue, the Court denied the motion for summary judgment.  *Id*. at 182.   The Court found that there was an outstanding issue of material fact precluding summary judgment as to the adequacy of the agency's search, "[b]ecause any search in response to [the FOIA request] that left out these possibly key sources would not be 'reasonably calculated to uncover all relevant documents.'"  *Id*.  The Court continued:

> The possibility that unsearched personal email accounts may have been used for official business raises the possibility that leaders in the [agency] may have purposefully attempted to skirt disclosure under the FOIA.

*Id*. at 184.

Not only are the facts of this case far more egregious than those in *Landmark Legal Foundation*, but the conclusion reached by the Court in *Landmark Legal Foundation* is well-

---

[3]     The motivation of Mrs. Clinton is relevant because, as head of the agency, her actions and decisions related to the management of the State Department's records obviously are imputed to the agency.

supported by case law.  In the case of an agency's obligation to search for responsive records allegedly outside its possession or control, the "critical issue . . . is the agency's motivation for disposing [of] or transferring" records.  *DiBacco v. U.S. Army*, 795 F.3d 179, 192 (2015); *see also Kissinger*, 445 U.S. at 155 ("There is no question that a 'withholding' must here be gauged by the time at which the request is made since there is no FOIA obligation to retain records prior to that request. . . . We need not decide whether this standard might be displaced in the event that it was shown that an agency official purposefully routed a document out of agency possession in order to circumvent a FOIA request.").  If an agency tries to thwart FOIA, FOIA compels that agency to take further action.  *See id.*; *see also Chambers*, 568 F.3d at 1004-1006; *SafeCard Services, Inc. v. Securities and Exchange Commission*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *Judicial Watch, Inc. v. U.S. Department of Commerce*, 34 F. Supp. 2d 28, 44 (D.D.C. 1998).  A court may compel production of illegally withheld records from an agency as well as from nonparties to which the agency transferred the records in an attempt to circumvent FOIA. *Judicial Watch, Inc.*, 34 F. Supp. 2d at 44.

The critical issue in this case, therefore, is whether Mrs. Clinton's and the State Department's creation and use of the "off-grid" record system and their concealment of the system for six years, deliberately thwarted FOIA.  Because of the "asymmetrical distribution of knowledge" between Plaintiff and the State Department (*Judicial Watch, Inc. v. Food and Drug Administration,* 449 F.3d 141, 145 (D.C. Cir. 2006)), Plaintiff requires discovery to obtain facts essential for the Court to make this determination.

**IV.    Discovery Is Warranted Because There Is a "Reasonable Suspicion" that the State Department and Mrs. Clinton Deliberately Thwarted FOIA.**

After denying the agency's summary judgment motion, the Court in *Landmark Legal Foundation* specifically found discovery was warranted because there was a "reasonable suspicion" that the agency deliberately thwarted FOIA.  *Landmark Legal Foundation v. Environmental Protection Agency*, 82 F. Supp. 3d 211, 220 (D.D.C. 2015).  Other courts have found the same.  *See Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 25 (D.D.C. 2000) (In FOIA cases, discovery is warranted when a plaintiff raises a "sufficient question as to the agency's good faith in processing or in its search.");  *see also Judicial Watch, Inc. v. U.S. Department of Commerce*, 34 F. Supp. 2d 28, 41 (D.D.C. 1998) (Discovery is warranted when it is necessary to explore "the extent to which [the agency] illegally destroyed and discarded responsive information" as well as to uncover the "possible methods for recovering whatever responsive information still exists outside of the [agency's] possession.").  Although Plaintiff has not yet conducted discovery, at least some of the relevant facts cannot reasonably be disputed or have already been established through admissible evidence.  Those facts show that there is at least a "reasonable suspicion" that the State Department and Mrs. Clinton deliberatively thwarted FOIA by creating, using, and concealing the "clintonemail.com" record system.

**A.    The State Department's general processes for responding to FOIA requests.**

John F. Hackett has worked for the federal government since at least 2004.  According to his LinkedIn profile,[4] Mr. Hackett was the Director of the Information Management Office for the National Counterterrorism Center from December 2004 to April 2006 and subsequently was

---

[4]    linkedin.com/in/john-hackett-06833537.

the Director of the Information Management Office for the Office of the Director of National

Intelligence until April 2013.  In April 2013, Mr. Hackett became the Deputy Director of the

Office of Information Programs and Services ("IPS") for the State Department.[5]  Third

Declaration of John F. Hackett (Nov. 13, 2015) (ECF No. 47-2) ("Third Decl.") at ¶ 1.  Mr.

Hackett then became Acting Director of IPS in March 2014 and became the permanent director

in June 2015.  *Id.*  In short, Mr. Hackett has been a senior official at IPS since April 2013.  As

director of IPS, Mr. Hackett has been singularly responsible for providing declarations and

testimony in the numerous lawsuits filed by Plaintiff and other FOIA requesters concerning Mrs.

Clinton's emails and the State Department's responses to their FOIA requests.[6]

According to Mr. Hackett, when the State Department receives a FOIA request, "IPS

evaluates the request to determine which offices, overseas posts, or other record systems within

the Department may reasonably be expected to contain the records requested."  *Id.* at ¶ 14.  IPS

then tasks individual offices with searching for responsive records.  *See* Transcript of July 29,

2015 Status Hearing, *Associated Press v. U.S. Department of State*, Case No. 15-cv-345-RJL

("Hackett Testimony") at pp. 22-23;[7] *see also* Third Decl. at ¶ 16 ("When conducting a search in

response to a FOIA request, the Department relies on the knowledge and expertise of the

---

[5]     Of relevance to this case, the core responsibilities of IPS include responding to FOIA requests and records management.  Third Decl. at ¶ 2.

[6]     Plaintiff will reference declarations and testimony of Mr. Hackett from the numerous cases currently pending in the U.S. District Court for the District of Columbia.  Plaintiff will identify each declaration or testimony transcript with the corresponding case number and is attaching each as an exhibit to this motion.  If no case number is referenced, the declaration was submitted in this matter.

[7]     The entire Hackett Testimony is attached as Exhibit A.

employees of each bureau/office/post to determine the files and locations reasonably likely to house responsive records."). Mr. Hackett further describes the process as follows:

> [W]hen IPS receives a FOIA request, it assigns the request to an IPS Case Analyst, who may handle 500 to 1,000 non-litigation FOIA requests at any given time. The Case Analyst reviews the request to discern the subject matter and date range of the request. The Case Analyst then relies on her or his knowledge of the Department to determine which offices or Bureaus are reasonably likely to have responsive documents, and the Case Analyst may also consult with her or his colleagues in IPS —including Reviewers, who are the Department's subject matter experts—for their opinions as well. The Case Analyst then identifies the points of contact ("POCs") in each of those offices or Bureaus or posts and sends those POCs a copy of the FOIA request and a "search tasker," which is a form that instructs the POCs to conduct a search and requires them to provide certain information (known as "search details") concerning what steps that POC took to conduct the search and the number of potentially responsive documents or materials located.

Second Supplemental Declaration of John F. Hackett, *Associated Press v. U.S. Department of State*, Case No. 15-cv-345-RJL (Aug. 5, 2015) (ECF No. 16-1), attached as Exhibit B, at ¶ 2.

Although the points of contact in the individual offices take the lead in conducting the searches for responsive records, IPS may, and often does, have an active role in the process:

> The IPS Case Analyst's role in this process is not limited to sending or receiving search taskers. Often, a POC or her or his designee will have questions concerning the scope or date range of the request, the steps necessary to conduct an adequate search, the available exemptions under FOIA, or the Department's obligations under the FOIA statute. Case Analysts may answer these questions in the first instance or may facilitate resolution of the POC's questions by identifying another person at the Department, for instance a supervisor or an attorney, who may be more qualified to address the particular issue raised by the POC. In other instances, POCs or their designees may conduct searches, provide material, and return their search tasker forms without asking questions of the Case Analyst. When the Case Analysts receive those completed search tasker forms, they may have additional questions for the POCs or request additional searching by the POC. Finally, a POC or the Case Analyst may recommend that searches in other locations throughout the Department be conducted, which may require the Case Analyst to send additional search taskers.

*Id*. at ¶ 3.  The points of contact vary based on the individual offices.  Mr. Hackett describes

them as "either a person," "an email box," or "the front office of a bureau."  Hackett Testimony

at pp. 22-23.  "It could be the executive director.  It could be a staff assistant.  It is a variety of

people within that organization, and they further task it within their bureau."  *Id*.

 With respect to the Office of the Secretary, the point of contact historically has been the

chief of staff[8] or a special assistant assigned to the Secretary.  Declaration of John F. Hackett,

*Canning v. U.S. Department of State*, Case No. 13-cv-831-RDM (Aug. 28, 2014) (ECF No. 19-

2), attached as Exhibit C, at ¶ 20.  After being tasked by IPS, the point of contact would

specifically search the email files of the Secretary.  *Id*.  The search is conducted this way because

IPS does not "have a big central archive of emails" that would allow "a search across

everybody's email account."  Hackett Testimony at p. 55.  In other words, to conduct a search

for records responsive to a FOIA request, each point of contact would have to "search[] specific

email accounts" in which that person believes records would exist.  *Id.*

### B.     The creation of the "off-grid" record system.

Very few facts are known about the creation of the "clintonemail.com" system.  Even less

are admissible.  However, according to the *New York Times*:

> Just before Hillary Rodham Clinton was sworn in as secretary of state in January
> 2009, she and her closest aides decided that she should have her own private

---

[8]     Cheryl Mills was Mrs. Clinton's Chief of Staff throughout her four years as Secretary of State.  Ms. Mills, a Stanford University law graduate and former Hogan and Hartson attorney who served as Associate White House Counsel under President Bill Clinton for nearly his entire presidency, is a seasoned veteran of multiple congressional and independent counsel investigations and lawsuits and is well versed in federal laws and regulations governing the retention and production of federal and other types of records.  See, e.g., *Alexander v. Federal Bureau of Investigation*, 541 F. Supp. 2d 274 (D.D.C. 2008) (describing Ms. Mills' substantial role in the White House's failure to properly records-manage email accounts and the effect of that failure on the White House's response to records requests).

> email address as Mrs. Clinton moved away from the Blackberry address that she had used during her 2008 presidential campaign.
>
> Private email would allow Mrs. Clinton to communicate with people in and out of government, separate from the system maintained at the State Department.
>
> An aide who had been with the Clintons since the 1990s, Justin Cooper, registered the domain name, clintonemail.com, which had a server linked to the Clintons' home address in Chappaqua, N.Y.

Amy Chozick and Steve Eder, "Membership in Clinton's Email Domain Is Remembered as a Mark of Status," *New York Times* (Mar. 4, 2015, available at nyti.ms/1zZn9lE).  Specifically, irrefutable evidence shows that the "clintonemail.com" domain name was registered on January 13, 2009,[9] the same day that the U.S. Senate Committee on Foreign Relations began hearings to confirm Mrs. Clinton as Secretary of State.[10]  Mrs. Clinton was sworn in on January 21, 2009.

### C.    The use of the "off-grid" record system.

During her four years as Secretary of State, Mrs. Clinton never used an email address on the "state.gov" system to conduct official government business.  Declaration of Joseph E. Macmanus (Aug. 19, 2015) (ECF No. 29-1) ("Mcmanus Decl.") at ¶ 5 ("Former Secretary of State Hillary Clinton did not use a state.gov account.").  Instead, Mrs. Clinton exclusively used an email address on the "clintonemail.com" system during the time period relevant to this case. "Updated:  The Facts About Hillary Clinton's Emails," available at hillaryclinton.com/p/briefing/ factsheets/2015/07/13email-facts/.  In addition, at least one other State Department official, Ms. Abedin, used an email address on the "clintonemail.com" system to conduct official government

---

[9]      who.is/whois/clintonemail.com.

[10]     www.gpo.gov/fdsys/pkg/CHRG-111shrg54615/pdf/CHRG-111shrg54615.pdf.

business.  Declaration of Hillary Rodham Clinton (Aug. 10, 2015) (ECF No. 22-1) ("Clinton Decl.") at ¶ 3.

Mrs. Clinton also never used government-issued equipment to send or receive her official email.  The State Department never issued Mrs. Clinton any type of personal computing device.  Macmanus Decl. at ¶ 5 (The Office of Information Resource Management within the Office of the Executive Secretariat "does not believe that any personal computing device was issued by the Department to former Secretary of State Hillary Clinton.").  Although the State Department has never said so expressly, this would appear to mean that the head of the agency had no State Department-issued personal computer, laptop computer, smart phone or Blackberry, or tablet or iPad.  In short, Mrs. Clinton and, at times, Ms. Abedin conducted official government business on a system that was separate and distinct from official State Department systems.

Mrs. Clinton nonetheless sent and received at least 30,490 official, State Department emails, totaling approximately 55,000 pages of federal records.  Third Decl. at ¶ 9; "Updated: The Facts About Hillary Clinton's Emails," available at www.hillaryclinton.com/p/briefing/factsheets/2015/07/13/email-facts.  Many of these emails were sent to and received by numerous high level State Department officials, including Ms. Mills, Ms. Abedin, Deputy Chief of Staff and Director of Policy and Planning Jacob Sullivan, Under Secretary of State for Management Patrick F. Kennedy, Under Secretary of State for Political Affairs William J. Burns (until July 2011), Under Secretary of State for Political Affairs Wendy Sherman (after September 2011), and various Assistant Secretaries.  *See* Emails sent or received by Ms. Mills and Mr. Kennedy to or from Mrs. Clinton's "clintonemail.com" email account, which are attached as Exhibit D; *see also* Interview of Cheryl Mills (Sept. 3, 2015), Select Committee on Benghazi, U.S. House of

Representatives ("Mills Interview"), attached as Exhibit E, at pp. 232-234 and "Updated:  The Facts About Hillary Clinton's Emails," available at www.hillaryclinton.com/p/briefing/factsheets/2015/07/13/email-facts/ (Mrs. Clinton readily acknowledged that her use of a non-"state.gov" email address "was widely known to over 100 Department and U.S. Government colleagues she emailed."). In addition, other State Department officials assisted Mrs. Clinton in creating and using the "clintonemail.com" system. *See* Emails between Mrs. Clinton and her staff, which are attached as Exhibit F. Members of her immediate staff helped her when she experienced technical difficulties. *Id*.

The State Department also hired Bryan Pagliano, the IT Director of Secretary Clinton's 2008 presidential campaign, to serve as a State Department IT Specialist. Mills Interview at pp. 240-243. Mr. Pagliano was hired as a Schedule C employee, which typically is reserved for "political" hires or a hiring that requires a close, confidential working relationship with an agency head or other key agency official. *Id*. In addition, it has been reported that Mr. Pagliano serviced and maintained the server that hosted the "clintonemail.com" system during Mrs. Clinton's four years as secretary. Carol D. Leoning, Rosalind S. Helderman, and Tom Hamburger, "FBI Looking into the security of Clinton's private e-mail setup," *The Washington Post* (Aug. 5, 2015, available at wpo.st/Alav0); Carol D. Leoning and Tom Hamburger, "Staffer who worked on Clinton's private e-mail server faces subpoena," *The Washington Post* (Sept. 2, 2015, available at wpo.st/mlav0). Mr. Pagliano reportedly was paid by Mrs. Clinton for his services. Rosaline S. Helderman and Carol D. Leoning, "Clintons personally paid State Department staffer to maintain server," *The Washington Post* (Sept. 5, 2015, available at wpo.st/vhav0). The State Department has disclaimed, however, that Mr. Pagliano reported any

outside income to the Department.  *Id*.  Mr. Pagliano left the State Department in February 2013, when Secretary Clinton left the Department.  *Id*.

While Mrs. Clinton and Ms. Abedin were using this "off-grid" system, departmental policies discouraged use of non-official email accounts to conduct official business.  *See* 12 FAM 544.3 ("It is the Department's general policy that normal day-to-day operations be conducted on an authorized [Automated Information System], which has the proper level of security control to provide nonrepudiation, authentication and encryption, to ensure confidentiality, integrity, and availability of the resident information."); *see also* U.S. Department of State and the Broadcasting Board of Governors Office of Inspector General, Office of Inspections, Report No. ISP-I-12-38A at 44 ("The Ambassador's requirements for use of commercial email in the office and his flouting of direct instructions to adhere to Department policy have placed the information management staff in a conundrum: balancing the desire to be responsive to their mission leader and the need to adhere to Department regulations and government information security standards.").  Moreover, in June 2011, Mrs. Clinton sent a memorandum to all State Department employees advising them to "[a]void conducting State Department business from [their] personal e-mail accounts."  Memorandum 11 State 65111 from Secretary of State Clinton to All Diplomatic and Consular Posts (June 28, 2011).

### D.    Background and processing of Plaintiff's FOIA request.

Ms. Abedin has been a long-time aide to Mrs. Clinton, dating back to her tenure as First Lady.  As a student at George Washington University, Ms. Abedin interned for the then-First Lady in 1996.  Ms. Abedin subsequently served as Mrs. Clinton's personal aide for several years and was a personal advisor during Mrs. Clinton's successful 2000 U.S. Senate campaign in New

York.  Ms. Abedin later worked as chief of staff and as a personal aide to the then-Senator during her unsuccessful campaign for the 2008 Democratic presidential nomination.

When Senator Clinton became Secretary of State on January 22, 2009, Ms. Abedin became Deputy Chief of Staff for Operations in the Immediate Office of the Secretary.  She remained in that position until June 2, 2012.  On June 3, 2012, Ms. Abedin became a senior advisor in the same office.  Ms. Abedin held this position until February 15, 2013, when then-Senator John Kerry became Secretary of State.

As a senior advisor, Ms. Abedin was classified as a special government employee, authorized to represent individual clients and engage in outside employment.  While also working for the State Department, Ms. Abedin worked for Teneo Holdings, an international consulting firm run by Douglas Band, a longtime aide to former President Bill Clinton. Raymond Hernandez, "Weiner's Wife Didn't Disclose Consulting Work She Did While Serving in State Dept.," *The New York Times* (May 16, 2013, available at nyti.ms/105AQxU).  In addition, Ms. Abedin also served as a paid consultant to the Clinton Foundation.  *Id.*

On May 21, 2013, Plaintiff submitted the FOIA request at issue in this case to the State Department seeking records about Ms. Abedin's classification as a special government employee.  Specifically, Plaintiff sought the following records, among others:

> Any and all records regarding, concerning, or related to the authorization for Ms. Huma Abedin to represent individual clients and/or otherwise engage in outside employment while employed by and/or engaged in a contractual arrangement with the Department of State.

Third Decl. at ¶ 4.  The time frame for the request was "January 1, 2010 to present."  *Id.*

When the State Department failed to provide a final determination within the statutory timeframe, Plaintiff sued.  *See* Joint Statement Regarding Briefing Schedule (Dec. 27, 2013)

- 15 -

(ECF No. 11) at 1.  The State Department answered, and, on December 27, 2013, the parties filed a joint meet and confer statement.  *Id*.  In the joint statement, the State Department represented that it was processing Plaintiff's FOIA request and that it would complete its processing of the request by February 14, 2014.  *Id.*

By letter dated February 12, 2014, the State Department represented to Plaintiff that it had completed processing its FOIA request.  Third Decl. at ¶ 6.  Specifically, the State Department represented that it had completed searches of the Office of the Executive Secretariat, among other offices.  *Id*.  In addition to searching its own record systems, the Office of the Executive Secretariat is responsible for coordinating searches of the Office of the Secretary, which is comprised of the Secretary's Chief of Staff, the Counselor of the Department, Deputy Chief of Staff, the Secretary's secretary, the Executive Assistant, special assistants, the Secretary's scheduler, staff assistants, and personal assistants.  Declaration of John F. Hackett, *Judicial Watch, Inc. v. U.S. Department of State*, Case No. 14-1242-RCL (July 7, 2015) (ECF No. 19-2), attached as Exhibit G, at ¶¶ 8-9.  At that time, Defendant did not identify the systems it searched within the Office of the Secretariat.  However, later Mr. Hackett testified that it searched, among other locations, the "state.gov" email accounts of Ms. Abedin; Ms. Mills; Cynthia Motley, former Administrative Officer for the Office of the Secretary; and Heather Samuelson, former Senior Advisor in the Office of the White House Liaison.  *See* Declaration of John F. Hackett (Aug. 14, 2015) (ECF No. 26-1) at ¶ 7 and Third Decl. at ¶ 20.

Although the State Department represented in its February 12, 2014 letter that it had completed searches of the Office of the Executive Secretariat, among other offices, it did not inform Plaintiff that it had not searched any email system used by Mrs. Clinton.  In fact, it was

not until the case was reopened[11] that the State Department determined that Mrs. Clinton's email was reasonably likely to contain responsive records.  Declaration of John F. Hackett (Aug. 14, 2015) (ECF No. 26-1) at ¶ 12.  The State Department also did not inform Plaintiff in February 2014 that it had not conducted a search of Mrs. Clinton's and Ms. Abedin's emails located on the "clintonemail.com" system.

On or about December 5, 2014, the State Department received approximately 55,000 pages of "hard copy" emails from Mrs. Clinton, purportedly in response to a November 4, 2014 letter to several former secretaries of state seeking assistance in identifying and making available to the State Department any federal records, "such as an email sent or received on a personal email account while serving as Secretary of State."  Third Decl. at ¶ 42.  Months later and in response to a letter requesting that she "provide any federal records in her possession concerning official government business sent or received on a personal email account while serving in her official capacity with the Department," Ms. Abedin also returned records to the State Department.  *Id.*  In total, Ms. Abedin returned approximately 29,000 pages of federal records, which include at least 6,714 official government emails.  *Id.*

At some point between June 19, 2015 and October 13, 2015, the State Department conducted supplemental searches of the Office of the Executive Secretariat.  At this time, a management analyst with knowledge of the electronic record system of the Office of the Executive Secretariat coordinated a search of the "state.gov" emails of Ms. Mills, Ms. Abedin, Ms. Motley, and Ms. Samuelson.  *Id.* at ¶ 20.  In addition, either the same or a different

---

[11]   On June 19, 2015, the Court reopened this case pursuant to Rule 60 of the Federal Rules of Civil Procedure.

management analyst conducted a search of the emails returned by Mrs. Clinton. *Id*. at ¶ 43.

Moreover, an IPS analyst conducted a search of the emails returned by Ms. Abedin. *Id*.

The State Department did not search the "clintonemail.com" system. Nor did it provide

guidance on how the "clintonemail.com" system should have been searched. With respect to

Mrs. Clinton's emails, Mrs. Clinton's personal attorneys, not State Department or U.S.

Government officials or employees, reviewed her emails to determine whether they were federal

records. Cheryl Mills letter to Patrick F. Kennedy (Dec. 5, 2014) (ECF No. 18-1) ("The

Secretary's electronic mail has been reviewed. Please find enclosed those electronic mails we

believe respond to your request."); Clinton Decl. (Aug. 8, 2015) (ECF No. 22-1) at ¶ 1 ("I have

directed that all my emails on clintonemail.com in my custody that were or potentially were

federal records be provided to the Department of State, and on information and belief, this has

been done."). Mrs. Clinton's personal attorneys, not State Department or U.S. Government

officials or employees, established the review process. Interview of Cheryl Mills at p. 252.

There is no evidence whatsoever that the State Department consulted with or advised

Mrs. Clinton's personal attorneys about the review process or the parameters for the review

process either before or after it occurred. There also is no evidence that the State Department

authorized or approved the review process. The State Department only appears to know that a

self-selected portion of Mrs. Clinton's emails from her tenure at the Department have been made

available. *See* Cheryl Mills letter to Patrick F. Kennedy (Dec. 5, 2014) (ECF No. 18-1); *see also*

Third Decl. at ¶ 42. The same is true for Ms. Abedin. Third Decl. at ¶42. Simply put, the State

Department has never reviewed the records on the "clintonemail.com" system to determine

whether they are federal records and whether they are potentially responsive to Judicial Watch's

FOIA request.  Third Decl. at ¶ 43.  Nor has it reviewed the "PST" files of Mrs. Clinton and Ms. Abedin to make these determinations. The State Department cannot say whether it has all federal records from the "clintonemail.com" system.  Hackett Testimony at p. 38.

> **E.      The "clintonemail.com" system after Mrs. Clinton left the**
> **State Department.**

When Mrs. Clinton left the State Department, neither she nor the State Department appear to have prepared an inventory of the records on the "clintonemail.com" system or made arrangements to ensure that the State Department would have ready access to federal records on the system.  This was directly contrary to the Foreign Affairs Handbook, which states, in part:

> The departing official or a staff member must prepare an inventory of personal papers and nonrecord materials proposed for removal. . . . When the inventory is completed, the departing official must request a review of the materials proposed for removal. In the Department, the records officer in cooperation with the S/ES or appropriate administrative office will conduct the review for Presidential appointees confirmed by the Senate.

5 FAH-4; H-217.2(b)(1) and (2).  In effect, Mrs. Clinton took the "clintonemail.com" system with her when she left the State Department.

In late May 2013, less than three months after she left the State Department, Mrs. Clinton hired Platte River Networks to maintain the emails located on the "clintonemail.com" system. Mills Interview at p. 237; Greg Gordon and Anita Kumar, "Unbeknownst to Clinton, IT firm had emails stored on cloud; now in FBI's hands," *McClatchy* (Oct. 3, 2015, available at www.mcclatchydc.com/news/nation-world/national/article37968711.html).  Platte River Networks subsequently transferred emails located on a server in Mrs. Clinton's Chappaqua, New York home to a Platte River Networks server in New Jersey.  *Id*.  In addition, Platte River

Networks retained Datto, Inc. to set up a cloud-based backup server that could provide immediate recovery if the primary server failed. *Id.*

In February 2014, Mrs. Clinton appears to have asked Platte River Networks to transfer her archived email "into [a] separate archive email box." Letter from U.S. Senator Ron Johnson to Under Secretary Kennedy (Sept. 22, 2015) ("Johnson Letter"), attached as Exhibit H. Later that same month, Platte River Networks transferred the archived emails onto a new email server, according to invoices obtained from Platte River Networks by the U.S. House of Representatives' Select Committee on Benghazi ("Select Committee"). *Id.*

In the summer of 2014, the State Department contacted Ms. Mills and advised her, apparently in her capacity as Mrs. Clinton's counsel, that the State Department would be releasing emails to the Select Committee and that these emails would disclose the existence of the "clintonemail.com" system. Mills Interview at pp. 244-48. The State Department also advised Ms. Mills that it expected to receive media inquiries about the account and sought information and an understanding of the "clintonemail.com" system so that it could appropriately respond to media inquiries. *Id.* In addition, records produced by Platte River Networks to the Select Committee show that, in July 2014, Mrs. Clinton asked Platte River Networks to copy Mrs. Clinton's emails located on the "clintonemail.com" system onto a DVD. Johnson Letter. Platte River Networks complied and sent the DVD to Ms. Mills via overnight mail. *Id.*

Ms. Mills told the Special Committee that she learned in the "late summer or September time, October time period" that the State Department was "going to be needing to augment their records and would be making a request to do that." Mills Interview at pp. 250-51. Ms. Mills also told the Special Committee that, after she received a November 12, 2014 letter from the

State Department asking Mrs. Clinton to return copies of any federal records, including email, of which she was aware, Mrs. Clinton asked Ms. Mills and David Kendall[12] to "oversee a process" for identifying her "potentially work-related" emails.  *See* Defendant's Notice of Filing (Aug. 6, 2015) (ECF No. 18-1); *see also* Mills Interview at p. 252 and Clinton Decl. at ¶ 1 ("I have directed that all my emails on *clintonemail.com* in my custody that were or potentially were federal records be provided to the Department of State, and on information and belief, this has been done.").

According to Ms. Mills, one of her associates – an attorney believed to be another former State Department employee, Ms. Samuelson – undertook the review of Mrs. Clinton's emails. *See* Mills Interview at p. 253; *see also* Rachel Bade, "Meet the Clinton insider who screened Hillary's emails," *Politico* (Sept. 4, 2015, available at politico.com/story/2015/09/hillary-clinton-insider-emails-heather-samuelson-screened-2016-213350).  Ms. Mills also told the Special Committee that, using a PST file provided by Platte River Networks – it is not yet known whether this PST file is the same archived data Platte River Networks sent Ms. Mills in July 2014 – Ms. Samuelson reviewed all of Mrs. Clinton's emails from her tenure at the State Department.  Mills Interview at p. 252.

According to Ms. Mills, the DVD was returned to Platte River Networks, and the original server that formerly was kept in the basement of Mrs. Clinton's Chappaqua, New York home is now in the possession of the U.S. Department of Justice.  Mills Interview at pp. 237, 253-254.

---

[12]     Mr. Kendall, of Williams and Connolly, LLP, is longstanding counsel of President and Mrs. Clinton and represents Mrs. Clinton with respect to the Select Committee's investigation. Letter from David E. Kendall to Rep. Trey Gowdy (March 27, 2015), attached as Exhibit I.

The status and location of the Platte River Networks server(s) and data is unknown, as is the status and location of the Datto, Inc. back up.

**V.     Additional, Admissible Facts Are Necessary for Plaintiff to Oppose the State Department's Motion for Summary Judgment.**

Despite not having the benefit of discovery, Plaintiff has been able to develop a substantial factual record, based upon unsworn interviews, public statements, correspondence, and media reports, among other sources, about Mrs. Clinton's and the State Department's creation, use, and concealment of this extraordinary and unprecedented, "off-grid" record system.  Plaintiff also has been able to develop a substantial set of facts about Mrs. Clinton's and Ms. Abedin's review of federal records in their possession.  These facts show there is at least reasonable suspicion that the State Department and Mrs. Clinton deliberately thwarted FOIA. Like the FOIA requester in *Landmark Legal Foundation*, however, Plaintiff requires discovery to obtain evidence that would be admissible at trial to establish these facts as well as to determine possible methods for recovering responsive records.

Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, formerly Rule 56(f), "if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or take discovery." Fed. R. Civ. P. 56(d)(2).  To obtain relief, the affidavit or declaration must:

1.     Outline the particular facts that the movant intends to discover and describe why those facts are necessary to the litigation;

2.     Explain why the movant could not produce the facts in opposition to the motion for summary judgment; and

3.     Show that the facts sought are discoverable.

*Convertino v. U.S. Department of State*, 684 F.3d 93, 99-100.  The attached Declaration of Michael Bekesha describes the particular facts that Plaintiff seeks, why these facts are necessary to this litigation, and why they are not already available.  The Declaration also shows that the facts Plaintiff seeks are discoverable.  The facts relate to four specific subject areas:

### A.     The creation of the "off-grid" system.

Based on media reports, we know that the "clintonemail.com" domain name was registered on the same day as Mrs. Clinton's confirmation hearings started and only eight days before she became Secretary of State.  However, we do not know why and under what circumstances the domain name was registered, why and under what circumstances email addresses were created on the system, and what, if any input or concern, career State Department employees had in the creation of the system.  We also do not know how Mrs. Clinton kept the creation of the system secret from the public for six years.  For the Court to determine whether the State Department and Mrs. Clinton deliberately thwarted FOIA, it is essential to discover the following facts about how and why the "clintonemail.com" system was created:

- Who, besides Mrs. Clinton, was involved in the decision to create the "clintonemail.com" system;

- Under what circumstances and for what reasons was the "clintonemail.com" system created;

- Who created the "clintonemail.com" system;

- How was the "clintonemail.com" system created;

- Who besides Mrs. Clinton and Ms. Abedin had email accounts created on the "clintonemail.com" system;

- Were any State Department monies, resources, or personnel used to create the "clintonemail.com" system;

- How and when did Mrs. Clinton inform career State Department employees that she created the "clintonemail.com" system to conduct official government business;

- When Mrs. Clinton informed career State Department employees that she created the "clintonemail.com" system to conduct official government business, did anyone advise her against it and, if so, who and why;

- Did Mrs. Clinton specifically instruct State Department employees not to inform the public or the National Archives and Records Administration about the creation of the "clintonemail.com system.

## B.     The use of the "off-grid" system.

Although we generally know the extent to which Mrs. Clinton used the "off-grid" system throughout her four years as Secretary of State, we do not know why both Mrs. Clinton and at least one other State Department employee, Ms. Abedin, used the system to conduct official government business.  We also do not know how and why Mrs. Clinton and other State Department employees kept the use of the system secret from the public for six years.  Plaintiff submits that discovery of the following facts about the use of the "clintonemail.com" system are necessary for the Court to determine whether the State Department and Mrs. Clinton deliberately thwarted FOIA:

- Who at the State Department besides Mrs. Clinton and Ms. Abedin used an email address on the "clintonemail.com" system to conduct official government business;

- Who at the State Department knew that Mrs. Clinton and Ms. Abedin were using "clintonemail.com" email addresses to conduct official government business;

- Were any State Department monies, resources, or personnel used to create the "clintonemail.com" system;

- Was Mrs. Clinton assigned a "state.gov" email address and, if not, why was she not assigned one;

- Why did the State Department not provide Mrs. Clinton with any personal computing devices to conduct official government business;

- Was Mrs. Clinton advised at any point to use a "state.gov" email address to conduct official government business instead of a "clintonemail.com" email address;

- Was Ms. Abedin advised to use her "state.gov" email address exclusively to conduct official government business;

- Under what circumstances did Ms. Abedin use the "clintonemail.com" system to conduct official government business;

- From January 21, 2009 to the day that the *New York Times* reported that Mrs. Clinton used the "off-grid" system, how did the State Department handle FOIA and other legal requests that implicated Mrs. Clinton's email;

- From January 21, 2009 to the day that the *New York Times* reported that Mrs. Clinton used the "off-grid" system, did anyone at the State Department consider publicly disclosing the use of the "clintonemail.com" system to conduct official government business;

- Who at the State Department assisted Mrs. Clinton and Ms. Abedin in using the "clintonemail.com" system or enabled them to use it to conduct official government business;

- Did the State Department deliberately conceal the existence of the "clintonemail.com" system from the public, and, if so, who at the State Department assisted with ensuring that the public would not find out about the use of the system to conduct official government business;

- Were State Department employees instructed not to inform the public or the National Archives and Records Administration about the use of the "clintonemail.com" system; and

- At any time between January 21, 2009 and the day that the *New York Times* reported that Mrs. Clinton used the "off-grid" system was any State Department employee disciplined or reprimanded for questioning the use of the "clintonemail.com" system to conduct official government business.

**C.      Mrs. Clinton left office without providing an inventory of and access to the "off-grid" system.**

We know Mrs. Clinton left with the "clintonemail.com" system and all records located on it at the end of her tenure.  We also know that the public continued to remain in the dark about the existence of the system for more than two years after Mrs. Clinton left office.  However, we

do not know why Mrs. Clinton was allowed to leave with the system.  Nor do we know why the

State Department waited until October 2014 to formally request that Mrs. Clinton return all

federal records from the "clintonemail.com" system.  Therefore, for the Court to determine

whether the State Department and Mrs. Clinton deliberately thwarted FOIA, it is essential to

discover the following facts about Mrs. Clinton's departure from the State Department with the

system, Mrs. Clinton's management and preservation of the system after she left the State

Department, and the State Department's request for the return of records from the system:

- Did the State Department request that Mrs. Clinton and Ms. Abedin provide an inventory or other accounting of records on the "clintonemail.com" system before they left and, if not, why not;

- Did Mrs. Clinton and Ms. Abedin create an inventory of records that they intended to remove and, if not, why not;

- At any time did the State Department attempt to preserve or ensure access to the federal records located on the "clintonemail.com" system;

- Prior to October 2014, did the State Department request that Mrs. Clinton and Ms. Abedin return all federal records located on the "clintonemail.com" system;

- When and under what circumstances did the State Department realize it did not have all federal records from the "clintonemail.com" system;

- Once the State Department realized it did not have all federal records from the "clintonemail.com" system, what steps did it take to gain possession of them;

- Once the State Department realized it did not have all federal records from the "clintonemail.com" system, why did it not disclose this fact to the public;

- After the State Department requested that Mrs. Clinton and Ms. Abedin return all federal records in their possession, did the State Department provide them with any guidance as to how to complete the task;

- How did Mrs. Clinton and Ms. Abedin decide which records from the "clintonemail.com" system they were going to return to the State Department;

- Of the emails not returned to the State Department, what emails, if any, were deleted

from the "clintonemail.com" system, who decided to delete them, and when was the
decision to delete them made;

- Under what circumstances was any decision made to delete emails from the
  "clintonemail.com" system that were not returned to the State Department;

- Did Mrs. Clinton and Ms. Abedin comply with all appropriate federal records laws,
  rules, and regulations when they decided which emails from the "clintonemail.com"
  system to return to the State Department;

- Does Mrs. Clinton or any of her representatives, including Mr. Kendall, Ms. Mills,
  and Ms. Samuelson, have an archived copy (i.e., PST file) of the "clintonemail.com"
  system that contains all emails sent or received during Mrs. Clinton's tenure as
  Secretary of State;

- Does Platte River Services have an archived copy (i.e., PST file) of the
  "clintonemail.com" system that contains all emails sent or received during Mrs.
  Clinton's tenure as Secretary of State;

- Does Datto, Inc. have an archived copy (i.e., PST file) of the "clintonemail.com"
  system that contains all emails sent or received during Mrs. Clinton's tenure as
  Secretary of State;

- If an archived copy of the "clintonemail.com" system containing all emails sent or
  received during Mrs. Clinton's tenure as Secretary of State does not exist, does any
  other type of archived copy exist of the system; and

- If an archived copy of the "clintonemail.com" system containing all emails sent or
  received during Mrs. Clinton's tenure as Secretary of State does not exist, who made
  the decision not to retain such a copy and why and when was that decision made.

### D.     The State Department's response to Plaintiff's FOIA request.

When the State Department first searched for records responsive to Plaintiff's FOIA

request, it did not search Mrs. Clinton's email records or system, notwithstanding the basic fact

that her email would likely contain responsive records.  We do not know, however, why her

email records or system was not searched.  Therefore, for the Court to determine whether the

State Department and Mrs. Clinton deliberately thwarted Plaintiff's FOIA, it is essential to

discover whether Mrs. Clinton's email records or system was not searched because the State

Department did not have the ability to search them or because the State Department determined that her email records or system would not likely contain responsive records.

## VI.     Plaintiff's General Litigation Plan.

If requested, Plaintiff is willing to provide a detailed discovery plan within two weeks after its motion is granted.  Nonetheless, Plaintiff generally intends to take the following discovery:[13]

1.     To establish admissible evidence about the creation and set up of the "clintonemail.com" system and the State Department's knowledge, awareness, authorization, or acquiescence in its use by Mrs. Clinton, Ms. Abedin, and any other State Department personnel who may have used the system, Plaintiff will need to depose State Department officials or employees who had oversight and management responsibilities relating to information systems at the department, as well as officials or employee who were involved in planning and assisting with Mrs. Clinton's transition and arrival at the State Department.  These may include Under Secretary for Management Patrick F. Kennedy, Director of IPS John F. Hackett, and Executive Secretary Joseph E. Macmanus.  To the extent relevant personnel have left the State Department's employment, Plaintiff may have to serve third party deposition and/or document subpoenas on such persons after they have been identified.  It also may include third party depositions and/or document requests to private persons or entities who may have advised or assisted Mrs. Clinton on the establishment of the system, including persons registered the domain name and obtained, set up, and coordinated the equipment, software, data files, etc.

---

[13]     Plaintiff reserves the right to conduct additional discovery as necessary based on new facts gathered during discovery.

needed for the system.  It may also include the submission of interrogatories and document requests to the State Department.

2.  To establish admissible evidence about use of the "clintonemail.com" system by Mrs. Clinton, Ms. Abedin, and possibly others at the State Department, Plaintiff will require the depositions of State Department officials who had oversight and management responsibilities relating to email, record and information management, and FOIA.  Such officials may include Under Secretary for Management Patrick F. Kennedy, Director of IPS John F. Hackett, and Executive Secretary Joseph E. Macmanus.  Plaintiff will also require depositions of State Department officials or employees who assisted Mrs. Clinton with the use, maintenance, and service of the "clintonemail.com" system.  Plaintiff also will require depositions of officials and employees responsible for responding to record requests concerning Mrs. Clinton's emails, and who were responsible for ensuring that Mrs. Clinton was able to communicate and conduct official government business.  Such officials and employees include Ms. Abedin, Ms. Mills, and Mr. Pagliano and others within the IT Department, the Executive Secretariat, or the Office of the Secretary.  Given Mr. Pagliano's crucial role in servicing and maintaining the server, Plaintiff also intends to seek discovery into the facts and circumstances of Mr. Pagliano's hiring and, to the extent Mr. Pagliano is unwilling to testify, Plaintiff may seek substitute discovery from other witnesses.[14]

---

[14]  It has been reported that Mr. Pagliano invoked his *Fifth Amendment* right against self-incrimination when subpoenaed to testify before the Select Committee.  Byron Tau and Emma Court, Hillary Clinton Aide Bryan Pagliano Invokes Fifth Amendment in Email Probe," *The Wall Street Journal* (Sept. 10, 2015, available at on.wsj.com/1i1A97P).  Therefore, Plaintiff does not know whether Mr. Pagliano will provide it with the facts necessary to demonstrate that the State Department deliberately thwarted FOIA.

Again, as relevant personnel may have left the State Department's employment, Plaintiff may have to serve third party deposition and/or document subpoenas on such persons after they have been identified.  Plaintiff's anticipate discovery regarding the use of the "clintonemail.com" system also is likely to include interrogatories and document requests to the State Department.

3.	To establish admissible evidence about the circumstances under which Mrs. Clinton and Ms. Abedin were able to leave the State Department without preparing an inventory of records they sought to remove  or otherwise ensure that access to federal records on the "clintonemail.com" system were readily available, Plaintiff will require the deposition of State Department officials and employees who oversaw, managed, or were involved in Mrs. Clinton's and Ms. Abedin's departure from the department.   Again, as relevant officials and employees may have left the department, Plaintiff may have to serve third party deposition and/or document subpoenas after they have been identified.

4.	To determine whether additional, responsive emails exist and to identify where they may be located, Plaintiff will require third party document and deposition subpoenas to persons and/or entities involved in the maintenance of the "clintonemail.com" system since Mrs. Clinton left the State Department in February 2013.  These persons and entities are likely to include Platte River Networks and Datto, Inc. and may require subpoenaing of archived copies (i.e. PST files) of Mrs. Clinton's and Ms. Abedin's emails.  They also may include Mr. Pagliano, Ms. Mills, Ms. Samuelson, and Mr. Kendall, and the Clinton Executive Services Corporation, which, Plaintiff understands, retained Platte River Networks and Datto, Inc. to provide internet server and backup services.

**VII.    Conclusion.**

For all the reasons stated above, Plaintiff's motion for discovery should be granted.

Dated:  December 11, 2015                        Respectfully submitted,

                                                 /s/ Michael Bekesha
                                                 Michael Bekesha
                                                 D.C. Bar No. 995749
                                                 JUDICIAL WATCH, INC.
                                                 425 Third Street S.W., Suite 800
                                                 Washington, DC 20024
                                                 (202) 646-5172

                                                 *Counsel for Plaintiff Judicial Watch, Inc.*