**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————
                                                    )
JUDICIAL WATCH, INC.,                               )
                                                    )
    Plaintiff,                   )
                                                    )
      v.                )    Civil Action No. 13-CV-1363 (EGS)
                                                    )
UNITED STATES DEPARTMENT OF                         )
STATE,                                              )
                                                    )
    Defendant.                   )
—————————————————————)

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PERMISSION TO DEPOSE HILLARY CLINTON,**
**CLARENCE FINNEY, AND JOHN BENTEL**

**INTRODUCTION**

In originally seeking leave to conduct discovery in this Freedom of Information Act ("FOIA") case, Plaintiff Judicial Watch, Inc., contended that it needed to determine whether "the State Department and its former secretary deliberately thwarted FOIA by creating, using, and concealing" the clintonemail.com system used by former Secretary Clinton to conduct State Department business. Pl.'s Mot. for Discovery at 2 (ECF No. 48). In granting discovery, the Court accepted that Plaintiff's allegation of intent to thwart FOIA "goes directly to the type of circumstance" not addressed by the Supreme Court's decision in *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136 (1980). May 4, 2016 Mem. and Order at 11 (ECF No. 73). The fundamental question for the discovery authorized by the Court is thus whether there is evidence of intent to thwart FOIA.

The parties have now completed all the discovery authorized by the Court. Six individual witnesses have been deposed, the State Department itself has been deposed through a 30(b)(6)

designee, State has answered Plaintiff's interrogatories, and State has voluntarily produced documents to Plaintiff.  Plaintiff nonetheless seeks leave to conduct more discovery, requesting permission to depose former Secretary of State Hillary Clinton; Clarence Finney, deputy director of the Executive Secretariat Staff ("S/ES-S");[1] and John Bentel, former director of the Executive Secretariat's Bureau of Information Resources Management ("S/ES-IRM").  Pl.'s Mot. for Permission to Depose Hillary Clinton, Clarence Finney, and John Bentel (ECF No. 97) ("Pl.'s Mot.").

Plaintiff's motion should be denied.  Plaintiff has not demonstrated a need for additional discovery, which as the Court recognized when it ordered limited discovery in this case, is rare in FOIA cases.  May 4, 2016 Mem. and Order at 8-9.  Plaintiff's motion presents a selective explanation of the evidence.  Contrary to Plaintiff's vague contention that "important questions remain," the discovery that Plaintiff itself designed has not revealed a shred of evidence indicating an intent to thwart FOIA.  To the contrary, documents that might have been interpreted as reflecting a concern about FOIA have been shown, through sworn testimony, to have a much more innocuous explanation.  Nor have any of the other inquiries into former Secretary Clinton's email practices, conducted by the FBI, the State Department's Inspector General, and the House Select Committee on Benghazi, discovered any evidence of an intent to thwart FOIA.  Plaintiff has an answer to the question it posed; it just does not like it.  Plaintiff's dissatisfaction with the record that it has been able to create is not a valid reason to extend the limited discovery the Court authorized.

---

[1] Prior to January 21, 2013, Mr. Finney was Director of the Office of Correspondence and Records within the Executive Secretariat ("S/ES-CR").  Effective January 21, 2013, S/ES-CR was merged with S/ES-S and Mr. Finney's job title changed accordingly.  His job functions did not change.  *See* 30(b)(6) Dep. Tr. at 14:21-15:1.

Although Plaintiff seeks only three additional depositions, none is justified.  With respect to former Secretary Clinton, the record evidence does not demonstrate any intent to thwart FOIA. According to the sworn testimony, the Secretary had, as a matter of convenience, used a single personal email account for work and personal purposes both during her time in the Senate and in her 2008 presidential campaign, and her use of a personal account at State was simply a continuation of that practice.  To the extent that she or anyone on her staff considered the FOIA implications of her use of a personal email account, the evidence elicited by Plaintiffs shows that they believed that her emails to State Department employees were being retained on the State Department's computer systems.

Plaintiff also cannot justify deposing Mr. Finney.  It is undisputed that Mr. Finney never knew about former Secretary Clinton's personal email account during her tenure as Secretary of State, and Plaintiff's suggestion that Mr. Finney could testify about "why" he did not know what he did not know makes no sense.  Moreover, Mr. Finney's supervisor Karin Lang, the Director of the Executive Secretariat Staff, was State's 30(b)(6) designee, and she testified at length about Mr. Finney's lack of knowledge based upon her multiple hours of meetings with him in preparation for her deposition.  Questions about what Mr. Finney knew and how that related to State's processing of FOIA requests fell squarely within the 30(b)(6) deposition topic, and the questions that Plaintiff seeks to ask through a deposition of Mr. Finney should have been asked at that time.

A deposition of John Bentel, who is no longer an employee of the State Department, would also be inappropriate.  There is no evidence to suggest that Mr. Bentel has any knowledge about why former Secretary Clinton used clintonemail.com for official State Department

business, and he in fact stated, under penalty of perjury, during a transcribed interview with the House Select Committee on Benghazi in 2015 that he has no such knowledge.

With all the discovery authorized by the Court completed, there remains no evidence that the State Department or former Secretary Clinton used clintonemail.com to thwart FOIA and no basis to believe that the additional discovery that Plaintiff seeks would result in any such evidence.  The Court should deny Plaintiff's request to depose former Secretary Clinton, Mr. Finney, and Mr. Bentel.  In the alternative, the Court should defer ruling on Plaintiff's motion because additional State Department records may be received by State.

## BACKGROUND

Plaintiff responded to State's motion for summary judgment by seeking discovery to challenge the adequacy of State's search for records responsive to Plaintiff's FOIA request.  The essence of Plaintiff's response was that State's search was inadequate because, even though it searched the approximately 55,000 pages of emails provided to State by former Secretary Clinton, it failed to search the clintonemail.com system itself.  Plaintiff argued that *Kissinger's* "possession or control" holding does not apply where "an agency official purposefully routed a document out of agency possession in order to circumvent a FOIA request.'"  Pl.'s Mot. for Discovery at 6 (quoting *Kissinger*, 445 U.S. at 155).

Accordingly, Plaintiff sought discovery to determine whether the State Department and former Secretary Clinton deliberately thwarted FOIA by creating, using, and allegedly concealing clintonemail.com.  *Id*. at 2-3.  Plaintiff set forth evidence that it claimed showed a "reasonable suspicion" that State and former Secretary Clinton deliberately thwarted FOIA through the use of clintonemail.com, *id*. at 7-22, and maintained it needed discovery to develop

further admissible evidence, as well as to determine whether additional, responsive emails exist and where to find them.  *Id*. at 22-30.

The Court granted Plaintiff's discovery request over State's objection that discovery was not needed to determine whether State's search was adequate.  The Court permitted "limited discovery" on the creation, purpose, and use of the clintonemail.com server so that the Court could decide whether State's search for records responsive to Plaintiff's FOIA request was adequate.  *See* May 4, 2016 Mem. and Order at 1, 12.  The discovery thereafter agreed to by the parties and ordered by the Court was limited in scope, extent, and duration, consistent with the narrow issue to be determined.  *See id.* at 12-15.  The Court's discovery order specified that Plaintiff must seek permission to conduct any additional discovery.  *Id.* at 15.  The parties then conducted the authorized limited discovery over the specified eight-week period, consisting of the seven depositions, including a 30(b)(6) deposition of the State Department, and interrogatories set forth in the discovery order.  In addition, State agreed to produce certain documents requested by Plaintiff.  *See* June 14, 2016 Minute Order.

While this discovery was underway, or just shortly after, three other inquiries into former Secretary Clinton's use of a personal email account to conduct government business concluded, resulting in a wealth of information being released to the public on the subject.  First, on May 26, 2016, the State Department's Inspector General released an 80-page report entitled "Office of the Secretary:  Evaluation of Email Records Management and Cybersecurity Requirements," *available at* https://oig.state.gov/system/files/esp-16-03.pdf.  That report was released to the public with no redactions.  Although the OIG was highly critical of the former Secretary's email practices, it found no evidence, despite extensive inquiry, that anyone at the State Department approved former Secretary Clinton's conducting official business via a personal email account

on her private server.  The numerous current and former officials interviewed by the OIG, including senior Department officials who served under Secretary Clinton, current and former Executive Secretaries, and attorneys within State's Office of the Legal Adviser, were also "unaware of the scope or extent of [former] Secretary Clinton's use of a personal email account, though many of them sent emails to the Secretary on this account."  May 2016 OIG Report at 37.

Second, on June 28, 2016, the House Select Committee on Benghazi released its report, totaling just over 800 pages.  *See* Report of the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi, https://benghazi.house.gov/NewInfo.  Secretary Clinton testified before this Committee, *see* Hearing 4 Before the Select Committee on the Events Surrounding the 2012 Terrorist Attacks in Benghazi (Oct. 22, 2015) ("Clinton Cong. Tr."), *available at* https://www.gpo.gov/fdsys/pkg/CHRG-114hhrg98884/pdf/CHRG-114hhrg98884.pdf, as did, among other individuals, Cheryl Mills, Huma Abedin, John Bentel, and Patrick Kennedy.  Each of these witnesses testified to what he or she knew about former Secretary Clinton's use of a personal email account to conduct State business, and their interview transcripts are now publicly available.  *See* Select Committee on Benghazi, Interview Transcripts, http://democrats-benghazi.house.gov/work/interview-transcripts.

And third, on July 5, the FBI completed its investigation, following a referral from the Intelligence Community Inspector General, of Secretary Clinton's use of a personal email server during her time as Secretary of State and whether classified information was transmitted on that system.  *See* Federal Bureau of Investigation, Statement by FBI Director James B. Comey on the Investigation of Secretary Hillary Clinton's Use of a Personal Email System, https://www.fbi.gov/news/pressrel/press-releases/statement-by-fbi-director-james-b.-comey-on-the-investigation-of-secretary-hillary-clintons-use-of-a-personal-email-system.  In announcing

the conclusion of the investigation and the FBI's recommendation to the Department of Justice not to pursue criminal charges, Director Comey provided a statement that was also critical of the former Secretary's email usage.  Director Comey acknowledged that the FBI "discovered several thousand work-related emails that were not in the group of 30,000 that were returned by Secretary Clinton to State in 2014," but added that "we found no evidence that any of the additional work-related emails were intentionally deleted in an effort to conceal them."

On July 7, Director Comey testified for over four hours before Congress.  This testimony was broadcast live to the public.  Of note, Director Comey testified that the FBI did not believe that Secretary Clinton had used a personal email account to shield her correspondence from public disclosure.  Director Comey was asked whether "the reason she set up her own private server, in your judgment, [was that] she wanted to shield communications from Congress and from the public."  Oversight of the State Department: Hearing Before the Full House Comm. on Oversight and Government Reform, 114th Cong. at 1:00:58-1:01:22 (July 7, 2016), *available at* http://www.c-span.org/video/?412315-1/fbi-director-james-comey-testifies-hillary-clinton-email-probe.  Director Comey indicated that it was not: "I can't say that.  Our best information is she set it up as a matter of convenience.  It was an already existing system that her husband had and she decided to have a domain on that system."  *Id.*

On July 8, State sent a letter to Director Comey asking the FBI to provide the recovered work-related emails to State.  July 8 letter from Undersecretary Kennedy to Director Comey, attached hereto as Ex. 1.

## ARGUMENT

I.   **The Court Should Deny Plaintiff Leave To Depose Former Secretary Clinton, Clarence Finney, And John Bentel Because Plaintiff Has Developed No Evidence Of An Intent To Thwart FOIA, And Other Testimony Exists About Their Knowledge.**

   a.  **The Court Should Deny Leave To Depose Former Secretary Clinton.**

   i.  **Plaintiff Has Developed No Evidence Of Intent To Thwart FOIA.**

Plaintiff contends that former Secretary Clinton's deposition is necessary to provide a "definitive" answer to why the clintonemail.com system was created and why former Secretary Clinton used it to conduct State Department business. Pl.'s Mot. at 3. To the extent that Plaintiff contends that only the former Secretary could provide a "definitive" answer to these questions, that position is flatly inconsistent with Plaintiff's representation to the Court that former Secretary Clinton's deposition only "may" be necessary based on information learned during discovery. *See* ECF No. 58-1 at 3. Plaintiff fails to explain what additional information it learned in discovery that makes the former Secretary's testimony more necessary now than it was when Plaintiff filed its discovery plan. The fact of the matter is the opposite: Plaintiff has learned through discovery why the clintonemail.com system was created and why former Secretary Clinton used it to conduct official business, and it has nothing to do with thwarting FOIA.

The evidence obtained through Plaintiff's discovery shows that former Secretary Clinton had used a single, personal email account for both personal and work purposes dating back to her time in the Senate and continuing through her 2008 presidential campaign, as was her preference, and her use of a personal email account at the State Department simply represented a continuation of that practice. The evidence further shows that to the extent that Secretary Clinton or anyone on her staff considered the records management or FOIA implications of the

Secretary's practice, they believed that it was permitted and that emails sent to recipients with state.gov accounts would be retained on the State Department system.

As Huma Abedin, who served as deputy chief of staff to Secretary Clinton, testified, former Secretary Clinton "always had a personal device since she had started using email," and thus had neither a "Senate.gov account" during her tenure in the Senate nor a "Hillary Clinton campaign account" during her 2008 presidential campaign.  Abedin Dep. Tr. at 38:22-39:4.[2] Prior to using a clintonemail.com account, former Secretary Clinton used "another email . . . associated with the Blackberry she was using during the presidential campaign," which "was HR15@AT[]T.BlackBerry.net."  Abedin Dep. Tr. at 25:17-22.

At some point, former Secretary Clinton began "experiencing technical issues . . . with that BlackBerry."  *Id*. at 26:9-13.  A server was already "in place at the Clinton[s'] residence prior to Secretary Clinton becoming Secretary," which was "used for [former President Clinton's] personal staff," Mills Dep. Tr. at 265:6-10; *accord* Clinton Cong. Tr. at 403 (noting that server "was already being used by my husband's team").[3]  Thus, to facilitate providing

---

[2] Because the Court ordered all deposition transcripts to be provided to the Court, State does not attach excerpts of deposition transcripts to this brief.  May 26, 2016 Minute Order.

[3] Plaintiff's contrary contention that former Secretary Clinton "was the primary driving force behind [the clintonemail.com system] and was its principal user" is unsupported by any citation to the record.  Pl.'s Mot. at 5; *see also id*. at 12.  The same is true for Plaintiff's contention that former Secretary Clinton chose "to allow one of her key aides, Ms. Abedin, to use the unofficial system for official communications as well."  *Id*. at 5.  Ms. Abedin's testimony directly refutes this assertion.  She testified that she obtained her clintonemail.com address in late 2008 as a result of Mrs. Clinton's 2008 presidential campaign and tenure in the Senate ending.  As such, Ms. Abedin was losing both her Senate email address and her presidential campaign address, "so I reached out to the person I had generally been in touch with in President Clinton's office on IT matters and asked him what I should do, since I was losing an email account.  I always had an email account associated with the Clinton family to deal with their – to deal with their personal matters."  Abedin Dep. Tr. at 21:4-10.  Justin Cooper "mentioned that they – there was an @Clintonemail.com address that he could provide for me, that he was doing a similar

technical support directly for former Secretary Clinton, she was given "an @Clintonemail.com address so they could help with IT issues."  Abedin Dep. Tr. at 26:13-15; *accord id.* at 37:5-13 ("[S]he was having problems with that AT&T address. Throughout the presidential campaign she was using it, throughout the 2008 presidential campaign, and was constantly having issues. And so we -- it was just a natural transition. It came with a new device and a new -- a new email address.  It was just technical difficulties.").

Thus, according to the testimony obtained during discovery, while former Secretary Clinton's transition to a clintonemail.com account came early during her tenure at the State Department, her use of a single personal email account to conduct business was a continuation of past practice.  *See* Abedin Dep. Tr. at 38:19-39:8 ("I just saw it as continu[ing] what she was doing before she arrived at the State Department.  She always had a personal device since she had started using email. . . . I experienced it as continuing the practice that she had had prior to arriving at the State Department, and continuing to use her personal device."); *accord, e.g.*, *id.* at 72:4-7 ("She had always had one BlackBerry device with one email account that she used as her primary email.  And it was a device and an account that she provided personally.").  Similarly, Cheryl Mills, counselor and chief of staff to Secretary Clinton, testified that "Secretary Clinton continued a practice that she was using of her personal email," and Ms. Mills could not recall "a specific discussion as opposed to her continuation of a practice she had been using when she was Senator."  Mills. Dep. Tr. at 45:7-12.  This testimony also explains why former Secretary Clinton

---

arrangement for the Secretary, and that we could – that I could also have that email address.  And he sent it to me."  *Id.* at 22:9-14.

This also shows an absence of an intent to thwart FOIA in Ms. Abedin's receipt of a clintonemail.com account.  Ms. Abedin did the vast majority of her work at the State Department on a state.gov email account.  *Id.* at 39:21-40:12, 219:21-220:7.

used a clintonemail.com account as opposed to a commercial account, *see* Pl.'s Mot. at 11—"so they could help with IT issues."  Abedin Dep. Tr. at 26:14-15.[4]

The relevant witnesses that Plaintiff requested in its proposed discovery plan testified that, contrary to Plaintiff's assertions of a plot to thwart FOIA, (1) they believed that it was permissible to use a personal email account or device to conduct State business, and (2) to the extent they thought about records management issues, they believed that their emails were being retained on State systems.  *See, e.g.*, Abedin Dep. Tr. at 40:19 ("I assumed it was okay to do."); *id.* at 117:14-17 ("I understood that everything that was on the State.gov system was kept in the system and retained in the system."); *id*. at 219:5-11 (Q "At any time during your tenure at the State Department, did you have any concerns about the Secretary's use of Clintonemail.com for State Department business?"  A "No I did not. . . .  I assumed it was allowed."); Mills Dep. Tr. at 183:21-184:4 ("It was my impression that when she emailed, because it was her practice to email people on their State accounts when she was doing State business, that any of those communications would be captured and maintained by the State Department system."); *id*. at 218:5-7; *id.* at 239:13-21 ("I assumed, I now know inaccurately, that records that were on a State system were ones that were kept forever.  Obviously I've come to learn that that's not the case.  And I thought since the Secretary's practice was to email people on their State records [sic], that there was resident in the department a set of records with respect to her work at the

---

[4] There is no reason to think—and Plaintiff provides none—that Bryan Pagliano, who provided information technology support for the clintonemail.com system, would provide any further insight into why the clintonemail.com system was created and why former Secretary Clinton used it to conduct State Department business.  *See* Pl.'s Mot. at 11-12.  The fact that he invoked his Fifth Amendment rights at his deposition, and therefore provided no testimony about his "appoint[ment [to State's Bureau of Information Resources Management] or the work he may have performed on the clintonemail.com system," *id*. at 12, has no bearing on whether former Secretary Clinton should be deposed.

department."). Secretary Clinton similarly testified before Congress that while she now believes her use of a personal email account was "a mistake," she understood it to have been "allowed" by the Department. Clinton Cong. Tr. at 401.

This practice was not an appropriate method of preserving federal records or making them available for searches under FOIA. *See, e.g.*, May 2016 OIG Report at 23 ("[S]ending emails from a personal account to other employees at their Department accounts is not an appropriate method of preserving any such emails that would constitute a Federal record."). Former Secretary Clinton also sent some work-related emails to people outside the State system. Witnesses repeatedly indicated that they wished they had considered these issues. *See, e.g.*, Mills Dep. Tr. at 190:19-20 ("I wish that had been something we thought about."); Abedin Dep. Tr. at 119:2-3 ("Honestly, I wish I thought about it at the time."). The key point, however, is that according to the sworn testimony, no one was deliberately seeking to thwart FOIA. *See* Abedin Dep. Tr. at 195:15-19 ("Q Did the Secretary not want her personal email account to be accessible pursuant to FOIA? . . . A I absolutely do not believe that, no."); *id.* at 220:22-221:3 ("Q Do you have any reason to believe that Clintonemail.com was used by anyone to thwart FOIA obligations? A Absolutely Not."); Mills Dep. Tr. at 263:7-11 ("Q Do you have any reason to believe that Secretary Clinton used Clintonemail.com to conduct government business because she or anyone else at the State Department was seeking to avoid FOIA? A Absolutely not.").

Indeed, Plaintiff's speculation about intent to thwart FOIA makes little sense for at least two more reasons. First, former Secretary Clinton used her email account to email dozens of State Department officials, all of whose email accounts are subject to FOIA and Congressional oversight. *See, e.g.*, Mills Dep. Tr. at 189:11-12 (noting that former Secretary Clinton emailed "more than a hundred" State employees). Had anyone focused on the FOIA implications of

former Secretary Clinton's use of a personal email account, it would have been obvious that her use of this email account would eventually become public knowledge.   And second, ample testimony confirms that former Secretary Clinton did the overwhelming majority of her State Department work through standard channels that are subject to FOIA.   *See, e.g.*, Mills Dep. Tr. at 257:20-258:8 ("She also received an enormous amount of paper.   She's a vociferous reader, and so she would read through all the different memorandas and materials . . . . [M]ost of the day she was in meetings or reading through briefing materials."); Kennedy Dep. Tr. at 92:9-94:12 (similar); Clinton Cong. Tr. at 401 (similar).

### ii. Discovery Has Refuted The Basis for Plaintiff's Theory of An Intent To Thwart FOIA.

When Plaintiff sought discovery in this case, it pointed to certain documents that, in Plaintiff's view, suggested an intent to thwart FOIA.   Discovery has revealed that these documents cannot properly be interpreted in this way.   Plaintiff has also not developed evidence of State Department knowledge of the scope and extent of former Secretary Clinton's use of clintonemail.com for work purposes.

**The August 30, 2011 Mull-Abedin Exchange**.   Plaintiff's reply memorandum in support of discovery pointed to an August 30, 2011 email exchange between Huma Abedin and Ambassador Stephen Mull, former Executive Secretary of the State Department, in which Amb. Mull wrote as follows:

> Separately, we are working to provide the Secretary per her request a Department issued Blackberry to replace her personal unit which is malfunctioning (possibly because of [sic] her personal email server is down). We will prepare two versions for her to use – one with an operating State Department email account (which would mask her identity, but which would also be subject to FOIA requests), and another which would just have phone and internet capability.

ECF 51 at 14.   Ms. Abedin subsequently responded that the State Department Blackberry "doesn't make a whole lot of sense."   ECF 51-3 at 1.   Plaintiff cited this exchange to contend that "senior management at the State Department was well aware that Mrs. Clinton was using a 'non-state.gov' system to conduct official government business" and "was concerned that records on the 'clintonemail.com' system were not being managed in a way that would allow for the State Department to search those records in response to FOIA requests."   ECF No. 51 at 14.   The Court also discussed this email exchange in its discovery order as a reason compelling discovery. May 4, 2016 Mem. and Order at 6.

Testimony about this email exchange does not support Plaintiff's interpretation.   Amb. Mull testified that he could recall no conversations about former Secretary Clinton's personal email server during his time as executive secretary, Mull Dep. Tr. at 74:13-1, and that he suggested "masking" the Secretary's identity merely to ensure that her email address was not "available to every employee in the State Department," *id.* at 77:22-78:-12.   Amb. Mull further testified that he could recall no "communications with anyone at the State Department about . . . Mrs. Clinton's email and FOIA requests."   *Id.* at 79-18:22.

Ms. Abedin also testified about her comment that a State Department Blackberry would not make sense.   Ms. Abedin explained that the initial request to the Executive Secretariat arose because of communications issues that the Secretary was having in the midst of a hurricane. According to Ms. Abedin, it did not make sense to provide former Secretary Clinton with an additional device because "[w]e were in the middle of a hurricane," Abedin Dep. Tr. at 176:14, and "[t]here were generally communication issues that were pretty widespread in New York at the time."   *Id.* at 176_19-24.   Because the issues would be "resolved once connectivity was restored and once the phone lines were up and systems were back up and running," *id.* at 177:4-

6, Ms. Abedin thought that adding "additional devices to something that was going to be corrected didn't seem to make a lot of sense to me." *Id.* at 177:6-8.  Ms. Abedin testified unequivocally that there was no intent to thwart FOIA.  *Id*. at 220:22-221:2.

Plaintiff fails to mention in its motion Ms. Abedin's explanation for why she thought a State Department Blackberry did not "make a whole lot of sense"—a comment that constituted a key reason why the Court ordered discovery to begin with.  May 4, 2016 Mem. and Order at 6.  Instead, Plaintiff highlights a "recently produced" email forwarded to Ms. Abedin, in which John Bentel and Monica Hanley, an aide to former Secretary Clinton, are discussing what former Secretary Clinton's email address would be on a State Department Blackberry.  Pl.'s Mot. at 7.  Mr. Bentel remarks to Ms. Hanley that "[y]ou should be aware that any email would go through the Department's infrastructure and be subject to FOIA searches."  *Id.*  Plaintiff makes much of the fact that this email was forwarded to Ms. Abedin before she made her comment to Amb. Mull that a State Department Blackberry "doesn't make a whole lot of sense."  *Id.*  But Mr. Bentel's comment that a State Department email account would be "subject to FOIA searches" is practically identical to what Amb. Mull said to Ms. Abedin in the email already in the record, and to which Ms. Abedin directly responded—that a State Department email account would "be subject to FOIA requests."  *Id.*  This email from Mr. Bentel therefore provides no additional, relevant information.  What is relevant is the testimony Plaintiff ignores, in which Ms. Abedin explains that she did not think providing former Secretary Clinton with an additional device in the form of a State Department Blackberry made sense because the problem with her personal Blackberry was likely to be resolved in the near term once the hurricane ended.

Ms. Abedin's explanation also applies to other instances Plaintiff points to of disruptions to service on clintonemail.com.  As an initial matter, Plaintiff's claim that the clintonemail.com

system "suffered multiple and repeated technical problems, weather-related disruptions, and known incidents of hacking," based on a mere *three* instances when former Secretary Clinton had trouble receiving email over the course of *four years*, is questionable.  Pl.'s Mot. at 5-7.  In any event, it made sense not to pursue a long-term solution of switching email accounts and providers to fix the short-term problem of intermittent disruptions in email service.  As Ms. Abedin testified regarding Secretary Clinton's missed call with a foreign minister due to a failed email communication, "once the system was back up and running, that . . . was [it] – we just proceeded with business the way it was before."  Abedin Dep. Tr. at 188:5-8.[5]

   **The January 23-24, 2009 Kennedy-Lukens-Mills Email.**  Plaintiff has also pointed to an email exchange among Patrick Kennedy, Lewis Lukens, and Cheryl Mills in which the participants discussed the possibility of former Secretary Clinton's checking her email through a computer on her desk in her office.  *See* ECF No. 52.  In the email exchange, Amb. Lukens suggests putting a "stand alone PC in the Secretary's office, connected to the internet (but not through our system) to enable her to check her emails from her desk."  ECF No. 52-1 at 2.  Undersecretary Kennedy responds that the "stand-alone separate network PC is on on [sic] great idea."  *Id.* at 2.  Plaintiff has suggested that this email shows "that senior management at the State Department was well aware that Mrs. Clinton was using a 'non-state.gov' system to conduct official government business."  ECF No. 52 at 1.  The Court also cited this email exchange in its discovery order.  May 4, 2016 Mem. and Order at 6.

---

[5] In the email chain regarding the missed call, Secretary Clinton stated to Ms. Abedin that she did not want "any risk of the personal being accessible" through a State email address, in response to Ms. Abedin's suggestion of getting a State account as a possible solution to the problem that caused the missed call.  Ms. Abedin testified that she understood this to mean that Secretary Clinton did not want her private, non-work related emails to be accessible.  Abedin Dep. Tr. at 188:17-189:16.

Discovery has not supported Plaintiff's theory.  Both Amb. Lukens and Undersecretary Kennedy testified to their understanding that Secretary Clinton was seeking to communicate with friends and family during the work day (i.e., not to conduct State business) and that their suggestion to put a separate network PC on her desk was made in that context.  *See* Lukens Dep. Tr. at 82:21-22 ("My understanding was for her to stay in touch with family and friends."); *id.* at 83:22 (same); Kennedy Dep. Tr. at 48:13:15 ("My recollection, there was a discussion with the Secretary about her desiring to be able to communicate with her family."); *id.* at 49:18-20 ("[I]t was resolved that the Secretary of State had a means of communicating with her family."). Undersecretary Kennedy could "recall no conversations" "about her wanting to communicate by email with State Department employees."  Kennedy Dep. Tr. at 50:4-6.

**State Department Knowledge/Approval.**  Discovery has produced no evidence that Secretary Clinton's use of a personal email account was approved by State.  Plaintiff acknowledges that it has discovered no evidence regarding "the State Department's knowledge about the creation of the clintonemail.com system and Secretary Clinton's decision to use the clintonemail.com system to conduct official government business."  Pl.'s Mot. at 4.  While Undersecretary Kennedy received "maybe 30-or-so-odd exchanges during the course of four years" with the Secretary, Kennedy Dep. Tr. at 10:15-16, he testified that he "did not focus on the 'from' line" but instead on the subject matter, which included things like "an ongoing evacuation of American citizens from a place of grave danger," Kennedy Dep. Tr. at 17:11-14, and "the death of an American citizen abroad," *id.* at 28:11-13.[6]  *See also* Abedin Dep. Tr. at 52:13-21 (testifying that she was not aware of Secretary Clinton requesting authorization from

---

[6] Undersecretary Kennedy also testified that he typically receives between 500 and 700 emails per day.  *See* Kennedy Dep. Tr. at 94:19-20.

anyone at the State Department to use her clintonemail.com account for State Department business).

This is consistent with the extensive inquiry performed by the Inspector General.  May 2016 OIG Report at 37 (numerous current and former officials, including the Under Secretary for Management (i.e., Undersecretary Kennedy) were "not asked to approve or otherwise review the use of Secretary Clinton's server and . . . had no knowledge or approval or review by other Department staff" and "were unaware of the scope or extent of former Secretary Clinton's use of a personal email account, though many of them sent emails to the Secretary on this account.").

**Records Retention Meeting.**  Nor did Ms. Abedin's testimony about a meeting with Mr. Finney near the end of Secretary Clinton's tenure to discuss record retention issues suggest any intent to thwart FOIA.  *See* Pl.'s Mot. at 9-10.[7]  Ms. Abedin explained that Mr. Finney met with her and other members of Secretary Clinton's staff to provide guidance on what materials could be taken upon departure and what materials should remain at the Department.  Abedin Dep. Tr. at 136:5-137:2.  She named four other staff members as being present at the meeting and stated that Cheryl Mills was not there.  She also said that Secretary Clinton was not at the meeting.  *Id.* at 142:11.  *See also id.* at 141:18-21 ("The people in that room were the support staff managing the -- the paper records that Secretary Clinton had -- had accumulated over her time at the State Department.).  There is no reason to think that Secretary Clinton would know what was said during this meeting that Ms. Abedin already testified about, or that she would know why none of

---

[7] Plaintiff erroneously states that the meeting took place a few months "before Secretary Clinton *took* office."  Pl.'s Mot. at 9 (emphasis added).  It is clear from Ms. Abedin's testimony on the meeting that it took place a few months before Secretary Clinton *left* office.  Abedin Dep. Tr. at 140:6-9 (Q:  "Do you remember when or how soon prior to leaving the State Department this meeting took place?  A:  "I remember it was a few months . . .").

the staff members told Mr. Finney about Secretary Clinton's work-related emails on clintonemail.com, either at the meeting or afterwards.

Finally, former Secretary Clinton's deposition is not necessary to determine whether the State Department "ceded control over the emails on the system."  Pl.'s Mot. at 8 (citing *Competitive Enterprise Institute v. Office of Science and Technology Policy*, No. 15-5128, slip op. at 6-9 (D.C. Cir. July 5, 2016) ("*CEI*")).[8]  It is uncontested that the State Department requested that Secretary Clinton provide it with any potential federal records contained on her private email account, and has again requested the same of the FBI with respect to the several thousand work-related emails it recovered, negating an inference that State ceded all control over those records.

\* \* \* \* \*

The discovery authorized by the Court failed to reveal any evidence that former Secretary Clinton sought to thwart FOIA by using clintonemail.com, and there is no reason to believe that a deposition of her would reveal any such evidence.  The Court should deny Plaintiff's request to depose former Secretary Clinton.

### b. The Court Should Deny Leave To Depose Clarence Finney, Whose Knowledge Was Described In Detail By State's 30(b)(6) Witness.

Plaintiff has also asked for leave to depose Clarence Finney, the Director of the Office of Correspondence and Records within the Executive Secretariat during Secretary Clinton's tenure as Secretary of State.  30(b)(6) Dep. Tr. at 14:10-15.  That office had responsibility for processing FOIA requests with respect to the Office of the Secretary.  *Id*. at 14:1-9.  While

---

[8] The Department of Justice is in the process of reviewing the *CEI* decision, which was issued less than a week ago.  On its face, however, the D.C. Circuit focused not on whether there is an intent to thwart FOIA, but rather on whether the agency has "ceded" control of the records.  Slip Op. at 6-7.

conceding that all the evidence of record indicates that "Mr. Finney was not aware of the clintonemail.com system," Pl.'s Mot. at 14, Plaintiff nonetheless argues that Mr. Finney's deposition is necessary to answer remaining questions "about how and why [he] was not made aware of the clintonemail.com system." *Id.*

As Plaintiff recognizes, Mr. Finney and the S/ES-CR office were unaware of former Secretary Clinton's use of a personal email account to conduct State Department business during her tenure.  As the 30(b)(6) deposition revealed, Mr. Finney periodically asked S/ES-IRM whether former Secretary Clinton had a state.gov email account.  30(b)(6) Dep. Tr. at 61-13:17.  Mr. Finney did not think to ask "if Mrs. Clinton was going to be using another email – a non-State.gov email account for work related purposes." *Id.* at 63:1-4.  After a photograph appeared in the news media of former Secretary Clinton appearing to use a mobile device, Mr. Finney "checked with S/ES-IRM to confirm . . . whether the answer was still that she did not have a State.gov email account." *Id.* at 64:4-9.  S/ES-IRM informed Mr. Finney that "she still did not have a State.gov email account." *Id.* at 64:15-16.[9]  Thus, the 30(b)(6) witness testified definitively that "Mr. Finney was not aware of email usage by the former Secretary," *id.* at 67:4-5 and, that he never received an email from her, *id.* at 67:6-8; *accord id.* at 165:19-166:1 ("Clarence Finney told me that he was not aware of former Secretary Clinton's use of a non-State.gov email account to conduct government business throughout her tenure, not for quite

_____

[9] Plaintiff complains that State objected and instructed the 30(b)(6) witness not to answer "[w]hen asked about specifics of Mr. Finney's conversation with S/ES-IRM." Pl.'s Mot. at 15.  After the witness testified that S/ES-IRM told Mr. Finney that Secretary Clinton still did not have a state.gov email account, counsel for Plaintiff asked the open-ended question, "[W]hat else did they discuss at that time?" 30(b)(6) Dep. Tr. at 64:20-21.  It was this question that prompted an objection from State that the question was vague and exceeded the bounds of the 30(b)(6) notice of deposition, and an instruction not to answer on that basis. *Id.* at 64:22-65:2.  Counsel for Plaintiff responded, "Sure" and continued with his questioning. *Id.* at 65:3-4.

some time after her tenure."). State's 30(b)(6) witness further testified that Mr. Finney "did not believe [that] anyone who worked for him had conversations about that topic with S/ES-IRM during that time period." *Id.* at 186:16-18. As the Court has recognized, the State Inspector General also found "no evidence that personnel involved in responding to FOIA requests were aware of Mrs. Clinton's clintomemail.com email address." May 4, 2016 Mem. and Order at 7 (citing Jan. 2016 IG Report at 14-15).[10] Because Mr. Finney did not know that former Secretary Clinton was using a personal email account to conduct government business, it makes little sense to imagine that he could testify to "how and why" he did not know what he did not know. Pl.'s Mot. at 14.

In any event, Plaintiff had ample opportunity to ask such questions at the 30(b)(6) deposition. The topic of that deposition was "the processing of FOIA requests, including Plaintiff's FOIA request, for emails of Mrs. Clinton and Ms. Abedin both during Mrs. Clinton's tenure as Secretary of State and after." May 4, 2016 Mem. and Order at 13. State's 30(b)(6) designee was Karin Lang, Director of the Executive Secretariat Staff and Mr. Finney's immediate supervisor. Ms. Lang prepared for her testimony by speaking with Mr. Finney three or four times, for several hours, 30(b)(6) Dep. Tr. at 66:9-18, and she even contacted Mr. Finney during the 30(b)(6) deposition to obtain additional information from him. *Id.* at 186:15-18.

Plaintiff's complaint that it had to learn about what Mr. Finney knew and did not know "through the filter of Ms. Lang [the 30(b)(6) witness]," "limited to the scope of the 30(b)(6)

---

[10] While the OIG stated in its May 2016 report that it did "find evidence that various staff and senior officials throughout the Department had discussions related to the Secretary's use of non-Departmental systems, suggesting there was some awareness of Secretary Clinton's practices," none of the examples discussed in the report involved personnel involved in responding to FOIA requests, including requests directed to the Office of the Secretary. May 4, 2016 OIG Report at 38-40.

deposition," rings hollow.  Pl.'s Mot. at 15.  It was Plaintiff's own strategic decision to propose a 30(b)(6) deposition, the scope of which it drafted, in lieu of depositions of individual State Department employees, including Mr. Finney, and other forms of discovery, such as requests for production of documents.  *See* Pl.'s Proposed Discovery Plan at 1-2 (ECF No. 58-1).  "Rule 30(b)(6) is intended to streamline the discovery process," *McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D. 70, 79 (D.D.C. 1999), allowing the examining party to "accomplish in a single deposition what it otherwise may have taken dozens of depositions to achieve." *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 308 F.R.D. 27, 38 (D.D.C. 2015).  Plaintiff obtained the benefits of the 30(b)(6) deposition, including receiving extensive testimony about Mr. Finney's knowledge and actions.  State and the Department of Justice, on the other hand, had to expend significant time and resources to prepare the 30(b)(6) witness.  *See* Ex. 3 to 30(b)(6) deposition (indicating the witness spoke to dozens of individuals in preparation for the deposition).  Plaintiff could and should have posed its remaining questions regarding Mr. Finney to the 30(b)(6) witness.

### c.  The Court Should Deny Leave To Depose John Bentel, Who Is Not Likely to Have Relevant Knowledge.

Plaintiff has also proposed deposing John Bentel, who retired as the director of the Executive Secretariat's information technology office, known as S/ES-IRM, in 2012.  The Court should deny Plaintiff leave to depose Mr. Bentel for the same reasons stated above – that further discovery is unnecessary because Plaintiff has developed no evidence of intent to thwart FOIA.  Nor has Plaintiff pointed to any evidence suggesting that Mr. Bentel would know whether or not Secretary Clinton or the State Department used clintonemail.com to deliberately thwart FOIA.

Plaintiff claims that the evidence shows that "Mr. Bentel or his staff failed to inform Mr. Finney . . . that Secretary Clinton was conducting official government business on an unofficial

email system." Pl.'s Mot. at 16. But the 30(b)(6) witness specifically testified that Mr. Finney did not recall who in S/ES-IRM he spoke to about whether former Secretary Clinton was using a state.gov email account, 30(b)(6) Dep. Tr. at 65:10-21, and there is no evidence suggesting it was Mr. Bentel. Plaintiff also asked certain of the deponents whether they discussed former Secretary Clinton's use of personal email with Mr. Bentel, Lukens Dep. Tr. at 56:18-57:4; Mull Dep. Tr. at 62:16-19; those witnesses said they did not; and no other witness indicated that he or she discussed this topic with Mr. Bentel.

As Plaintiff notes, Mr. Bentel did not speak with the 30(b)(6) witness as part of her preparation. Pl.'s Mot. at 17-18.[11] Mr. Bentel was interviewed, under penalty of perjury, by Congress about these issues. *See* Select Committee on Benghazi, U.S. House of Representatives, Interview of Executive Secretariat Director of Information Resources Management (June 30, 2015), *available at* http://askedandanswered-democrats.benghazi.house.gov/transcripts/ 2015_06_30_SCB_INTERVIEW_EX_IRM_Director.pdf ("Bentel Cong. Tr.").[12] Most importantly, Mr. Bentel testified that he had no knowledge of why former Secretary Clinton elected to use a personal email account to conduct State Department business. *Id.* at 38 ("Q At any time did Secretary Clinton or her representatives explain to anyone on your staff why she believed her private email system was necessary or preferable to using an official State government account? A Not that I'm aware of").

---

[11] Mr. Bentel is represented by private counsel.

[12] As with many other witnesses who testified before the Select Committee, Mr. Bentel's name was redacted from the publicly available transcript. *See* Report of the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi, Appendix I, fn. 1. The fact of his interview, however, is already publicly known.

**II.      In The Alternative, The Court Should Defer Ruling On Plaintiff's Discovery Motion.**

As noted above, last Friday, July 8, State sent a letter to Director Comey asking the FBI to provide State with the work-related emails the FBI recovered.   July 8 letter from Undersecretary Kennedy to Director Comey.   If State obtains additional State Department records, it intends to search them for records responsive to Plaintiff's request.   This has the potential to provide Plaintiff the relief it seeks in this case.   *See, e.g.*, Feb. 23, 2016 Hearing Transcript at 10-11 ("We're asking that [the clintonemail.com system of records] be turned over to the State Department so that the State Department can conduct the search it should have conducted originally.").   The Court should therefore, in the alternative, defer ruling on Plaintiff's request for additional discovery to allow this process to play out, given that it ultimately may render moot Plaintiff's claims regarding the adequacy of State's search.

## CONCLUSION

For all the foregoing reasons, the State Department respectfully requests that Plaintiff's Motion for Permission to Depose Hillary Clinton, Clarence Finney, and John Bentel be denied, or, in the alternative, deferred.

Dated:  July 12, 2016

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director

*/s/ Caroline Lewis Wolverton*
CAROLINE LEWIS WOLVERTON (DC 496433)
Senior Trial Counsel
STEVEN A. MYERS (NY 4823043)
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 305-8648
Fax: (202) 616-8460
Email: steven.a.myers@usdoj.gov

Attorneys for Defendant